UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------x
                                                 :
SILVIA SEIJAS, HEATHER M. MUNTON,                :
THOMAS L. PICO ESTRADA, EMILIO                   :      10 Civ. 4300 (TPG)
ROMANO, RUBEN WEISZMAN, ANIBAL                   :
CAMPO, MARIA COPATI, CESAR RAUL                  :      OPINION
CASTRO, HICKORY SECURITIES, LTD.,                :
ELIZABETH ANDREA AZZA, CLAUDIA                   :
FLORENCIA VALLS, RODOLFO                         :
VOGELBAUM, EDUARDO PURICELLI,                    :
AND RUBEN DANIEL CHORNY,                         :
                                                 :
                         Plaintiff,              :
                                                 :
        – against –                              :
                                                 :
THE REPUBLIC OF ARGENTINA and                    :
BANCO DE LA NACIÓN ARGENTINA,                    :
                                                 :
                         Defendant.              :
------------------------------------------------x
```

This action is the second attempt by plaintiffs in the Argentina bond cases to hold Banco de la Nación Argentina ("BNA"), as an "alter ego" of the Republic of Argentina, liable for judgments against the Republic. In the first attempt, EM Ltd. and NML Capital Ltd. filed a complaint against the Republic and BNA alleging that BNA was an alter ego of the Republic. After the court granted defendants' motions to dismiss the complaint, EM and NML filed a motion for reconsideration and the court vacated its dismissal. However, shortly thereafter EM and NML voluntarily withdrew their alter ego complaint.

Prior to the court's vacatur and the withdrawal of the EM and NML complaint, plaintiffs in this action—the Seijas plaintiffs—had filed their own alter ego complaint against the Republic and BNA alleging almost the same facts; and defendants had filed motions to dismiss the Seijas complaint.  Although EM and NML withdrew their complaint, the Seijas plaintiffs have gone forward with their alter ego claim.  The court converted the motions to dismiss into motions for summary judgment at a hearing on November 4, 2010.

Plaintiffs have sought to obtain discovery from defendants, primarily in the form of depositions of persons filing declarations in support of defendants.  The court has denied this discovery, finding that there is sufficient information now before the court for the summary judgment motions to be dealt with fairly.

Defendants' converted motions for summary judgment are granted, and the case is dismissed.

### **Background**

Plaintiffs are the named plaintiffs in eight certified class actions pending against the Republic arising out of the Republic's default in 2001 on its bonds.

Founded in 1891, BNA is the largest Argentine commercial banking institution.  BNA operates over 600 branch offices, including one in New York.  BNA is wholly-owned by the Republic, and an instrumentality of the Republic.

Plaintiffs filed this action against the Republic and BNA seeking (1) a declaratory judgment holding that BNA is an alter ego of the Republic (Count I); and (2) an adjudication that BNA, as an alter ego of the Republic, is jointly and severally liable to satisfy existing judgments in favor of plaintiffs and against the Republic (Counts II-IX).

Procedural History

It is important to review the procedural history of both alter ego actions against BNA before relating the facts.

A. Litigation against BNA by Plaintiffs EM and NML

In September 2008, the court signed orders in EM and NML's bond default cases attaching and restraining certain assets of BNA and the Republic.  EM and NML sought to attach BNA's assets on the theory that BNA was the alter ego of the Republic.  They also sought to attach any assets of the Republic held in BNA's custody.  EM and NML attached and restrained assets in both categories.

Plaintiffs EM and NML filed a complaint against BNA in September 2008 in 08 Civ. 7974.  EM and NML sought a declaratory judgment that BNA is an alter ego of the Republic, and an adjudication that BNA is jointly and severally liable to satisfy existing and future judgments in their favor and against the Republic.  That complaint's factual pleadings were similar to the one filed in the present Seijas action.

There were various cross-motions regarding the attachments and restraints, as well as the alter ego action.  The following is a summary of opinions rendered by the court.

      1.  <u>September 30, 2009 Opinion</u>

In the first opinion, issued on September 30, 2009, the court ruled that BNA was not an alter ego of the Republic.  The court found that the Republic does not control the day-to-day operations of BNA.  While there was evidence that the Republic sometimes required BNA to do financing for certain economic sectors of the country and for particular businesses, this did not rise to the degree of de facto ownership or control of BNA's funds sufficient to justify an alter ego ruling.

However, the court did state that something much closer to the alter ego territory occurred in late 2008 when the Republic procured a change in the law governing the bank's charter which greatly loosened the restrictions on the ability of the Republic to borrow money from BNA. Nevertheless, the alleged law offered only the potential for the Republic to use BNA's funds effectively as the Republic's own.  The record did not show any actual use by the Republic of this apparent expanded power to borrow from BNA.  Accordingly, the court concluded that "even the evidence about the expanded power of the Republic to borrow from BNA is not sufficient to justify holding that BNA was or is the alter ego of the Republic."

It is important to note that the court relied on plaintiffs' representation that the late 2008 proposed law was the version passed by the Argentine government.

On the basis of this ruling, the court vacated the attachments and restraints of <u>BNA's</u> assets, although the court confirmed part of the orders restraining certain of the <u>Republic's</u> assets held by BNA.  The court dismissed the separate alter ego action against BNA and the Republic.

### 2. <u>September 30, 2010 Opinion</u>

EM and NML moved for reconsideration of the September 30, 2009 opinion.  First, plaintiffs sought to introduce new evidence showing that the Republic now had actually used the apparent expanded power under the late 2008 legislation to borrow money from BNA with lessened restrictions.  Based on this new information, plaintiffs sought new attachments directed to property previously covered by the September 2008 orders, and certain additional properties.  This request was granted.  Second, plaintiffs asserted that the September 2009 opinion did not apply the controlling legal standards.

However, an important revelation about the late 2008 legislation occurred shortly before the court issued its September 30, 2010 opinion.  Plaintiffs informed the court that they had made an error in relying on proposed legislation introduced by Argentine President Fernández de Kirchner that would have amended BNA's charter by eliminating the

special guarantee requirement for loans from BNA to the Republic.  On November 21, 2008, a revised version of the legislation was actually signed into law, which did not eliminate the special guarantee requirement in BNA's charter.  In fact, the law ratified the requirement of the special guaranties contained in BNA's charter.  This court had adopted plaintiffs' erroneous description in its September 2009 opinion.

The EM and NML plaintiffs agreed that the orders of attachment and restraint as they related to property of BNA should be vacated. Thus, no attachments, restraints, or other restrictions remained on any property of BNA.

The court handed down an opinion in September 2010.  The court vacated its dismissal of the separate alter ego action but questioned whether the allegations in the alter ego complaint provided a sufficient jurisdictional basis once orders attaching and restraining BNA assets were set aside.  The court requested briefing on this issue.  The court also granted a motion to amend the alter ego complaint.

However, on November 29, 2010, EM and NML voluntarily dismissed their alter ego complaint against BNA without prejudice.

B. Litigation against BNA by Seijas Plaintiffs

Plaintiffs have eight certified class actions against the Republic pending.  On January 9, 2009, the court entered aggregate class judgments totaling approximately $2.2 billion, which were vacated by the Second Circuit on May 27, 2010.  The Circuit remanded for

- 6 -

recalculation.  <u>Seijas v. Republic of Arg.</u>, 606 F.3d 53 (2d Cir. 2010).  The recalculation issues have not yet been resolved.

Three days before the vacatur of the judgments, the Seijas plaintiffs had obtained *ex parte* restraining notices and a writ of execution.  The May 24, 2010 orders were directed to "property of Argentina" and property "in which the judgment debtor Argentina has an interest" and attempt to reach assets in the amount of more than $2.2 billion.  The restraining notices were directed to garnishee BNA.  The Republic filed a motion to vacate the restraining notices on June 7, 2010, but the court put the motion on hold at a June 8, 2010 conference pending the outcome of the two actions against BNA.

One day after the Second Circuit vacated the judgments in plaintiffs' class actions, and in the midst of EM and NML's briefing of their motion for reconsideration in their alter ego case against BNA, the Seijas plaintiffs filed on May 28, 2010 their own alter ego complaint against BNA with the same legal claims and on essentially the same facts as alleged in the EM and NML action, with the addition of two new allegations.  First, the Seijas plaintiffs allege that the late 2008 legislation "procured a fundamental change in BNA's charter which significantly loosened the restrictions on the ability of the Republic to borrow money from BNA."  This is a reference to the same 2008 legislation already discussed.  The Seijas complaint alleging this came some months before the EM and NML plaintiffs advised the court of their erroneous

description of the legislation.  Second, the Seijas plaintiffs allege that the Republic had actually used the apparent expanded power to borrow approximately 5.6 billion pesos from BNA.  This is the same evidence offered by EM and NML in its briefing of the motion for reconsideration. Plaintiffs further allege that the "conditions under which the 'loans' were issued show that the transaction was not on commercial terms" and the "interest rate is as low as 2.75%—significantly less than regular market rates."

On August 17, 2010, defendants filed their motions to dismiss the complaint for lack of personal and subject-matter jurisdiction, and for failure to state an alter ego claim.  The court converted these motions into motions for summary judgment at a hearing on November 4, 2010. Plaintiffs, who filed their opposition brief after the November hearing, assert that summary judgment for defendants should be denied as a genuine dispute exists over all of the material facts at issue here.

Facts Regarding Alter Ego Issue

BNA was created by the Argentine Congress in 1891, and describes itself as now "the largest commercial bank in Argentina."  The employees of BNA number approximately 16,000.  BNA has several hundred branch offices, including the branch in New York.  It has approximately 2.5 million accounts maintained by depositors ranging in size from small account holders to major international corporations.

BNA is empowered to litigate, hold property, and enter into contracts in its own name.  Although BNA concedes that it is wholly owned by the Republic, it claims that it operates independently from the Republic.  However, as plaintiffs note, BNA's website states that the bank's "principal purpose is to perform the function of financial agent for the Federal Government" and that it therefore "receives official deposits and makes payments for account and by order of the Nation."

BNA is governed by a charter enacted by the Argentine government in 1978 in Law 21,799.  The charter describes BNA as an "autonomous entity of the State" whose operations are guaranteed by the "Argentine Nation."  The bank is allowed to establish branches in both Argentina and other countries, although it is required to provide prior notification to the Ministry of Economy when opening or closing foreign branches.  The charter also provides that the "relations of the Bank with the National Executive Branch shall take place through the Ministry of Economy, except for merely formal issues in which it will communicate directly with the corresponding public departments."

The bank is governed by a board of directors, which is "designated by the National Executive Branch" and must include representatives of a variety of economic sectors.  However, members of the board may not hold "other positions or posts, compensated or remunerated in any manner, reporting directly or indirectly to the national, provincial, or municipal governments."  The Chairman and members of the board may

serve four-year terms, and may be reappointed.  If a Chairman or director resigns in the middle of his term, his replacement serves out the rest of that same term (rather than being automatically appointed for another full four-year term).  The board is required to meet twice a month and is empowered to set policy and oversee general bank operations.  It is also required to appoint a General Manager, who cannot hold "any other salaried position."  The board's compensation is "established by the National Executive Power."

The charter also states that BNA "shall coordinate its action with the economic-financial policies established by the national government," and provides that the "primary purpose of the Bank is to provide financial assistance to micro, small, and medium-sized companies, regardless of their economic activity."  In support of this mission, BNA "must" finance agricultural activities, support foreign trade, and cover "the needs of" industry, mining, tourism, and other economic activities. BNA may not issue loans exceeding 5 million pesos, except under certain circumstances.  In addition to these specific responsibilities, the bank is authorized to perform the usual functions of a bank.

The BNA charter restricts the bank from making loans to "the Nation, provinces, or municipalities, or to their entities or agencies, unless they have a special guarantee from the Department of the Treasury of the Ministry of Economy that allows for actual automatic reimbursement of the loan."  Law No 21,799, June 16, 1978, at Art. 25.

In late 2008, Article 74 of Law 26,422 confirmed this restriction and further required that such funds be "applied to the financing of capital expenditures or debt amortization" and the "balance of such debt does not exceed THIRTY PERCENT (30%) of the deposits of the Non-Financial National Public Sector with the awarding entity."

BNA's compliance with its charter and with other laws is overseen by "a Supervisor designated by the National Executive Branch." The Supervisor must sign the bank's yearly financial statements and may attend board meetings, though he is not entitled to a vote at the meetings. He is required to be a lawyer, accountant, or economist, and is appointed for renewable two-year terms.

According to a declaration by BNA's former President, Mercedes Marcó del Pont, BNA's board meets on a weekly basis, and minutes of its board meetings "have been maintained for 117 years." The board is divided into ten committees, which also meet weekly, and approve significant transactions entered into by the bank. Del Pont also states that the board's decisions "are not subject to review or approval by the executive branch and no member of the executive branch participates in the day-to-day operations of BNA." Despite the requirement that BNA fulfill certain missions (such as the provision of loans to small businesses), "BNA analyzes each prospective loan and assesses the risks independently of any input from the executive branch." Del Pont also characterizes the management of BNA as "extremely stable." In a

separate declaration, BNA's Supervisor (as of 2008) similarly states that the Republic does not exercise control over BNA's daily operations, and that the funds of BNA and the Republic are not commingled.

The first declaration by Juan Carlos Fábrega, BNA's General Manager at the time and now BNA's current President, offers similar statements.  Fábrega has been an employee of BNA since 1969.  He states that since becoming General Manager, he has never been "instructed or improperly pressured" "by a member of any branch of the Republic with regard to BNA's business or operations."  He also states that BNA does not receive appropriations from the Republic or commingle funds with the Republic's funds.  Specifically, any profits earned by BNA are used for the bank's "commercial purposes," in accordance with the charter.

In spite of the legal protections provided for BNA's independence, and the claims of BNA officials that the Republic does not interfere with the bank's operations, plaintiffs contend that the factual record "amply demonstrates that Argentina maintains 'extensive control' over BNA." Plaintiffs have submitted Argentine laws and media reports to support their allegations.  Most of the allegations are contested by BNA in their declarations.  These allegations may be organized into five categories.

A. Management and Organizational Structure

Plaintiffs first claim that BNA's chairman and directors are dependent on the president of the Republic for their positions and

compensation.  As a result, BNA has had ten chairmen in the last eleven years, and none has completed a four-year term.  Plaintiffs allege that this high rate of turnover is partly the result of the fact that members are either forced to resign because they disagreed with government policy, or are promoted to other government positions for being a bureaucratic ally.

As an example, plaintiffs offer the case of Ricardo J. Lospinnato who served less than four months as BNA's chairman.  Plaintiffs claim that Lospinnato "was insufficiently docile and did not kowtow" to a board member who was an ally of then President Nestor Kirchner.  Plaintiffs state that the "situation was eventually resolved when the government asked Lospinnato to tender his resignation."  Plaintiffs further claim that at the "same time that Lospinnato was dismissed, BNA's Vice President, Oscar Ferrari, was demoted, so that a Kirchner ally could fill his spot."  Plaintiffs infer that while BNA directors "may resign, they often do so under the extraordinary pressure exercised by the Executive Branch."

In response, BNA contends that part of the explanation for the turnover is that when a chairman resigns in the middle of his term, his successor may only complete the prior chairman's term, and must therefore be replaced at the beginning of the next four-year term.  BNA also asserts that during the period when most changes occurred, the country was undergoing one of the greatest financial crisis in its history.

Plaintiffs also claim in their briefing that BNA's board is much more active than those of other corporations.  As a result, plaintiffs argue

that BNA's managerial staff plays a largely passive, administrative role.

Plaintiffs claim that the board sets the terms and conditions for the

"minutest of transactions."  Plaintiffs offer the following from BNA's

charter as evidence.  The board approves all loans in excess of 1,690,000

pesos.  The board also determines the opening and closing of branches,

agencies, and representative offices at home and abroad; it directs the

purchase, sale, construction, and remodeling of BNA buildings; it

appoints directors, supervisors, trustees, and auditors for companies in

which BNA participates; and it approves the chairman's personnel

decisions.  BNA's chairman is authorized to hire all of BNA's general

managers, general assistant managers, and various departmental

managers.  The chairman can also appoint, transfer, promote, and

penalize officers and employees.

B. <u>Industry Loans</u>

Plaintiffs next claim that the Republic repeatedly compels BNA to

make certain financial commitments without regard to the impact of

these commitments on BNA.  One form of these commitments has been

financial assistance to troubled companies.  In 2002, the Republic

allegedly required BNA to take over three troubled banks.  Fábrega,

however, states that BNA merely performed administrative functions to

facilitate the sale of these banks to other financial institutions, and was

compensated for this work.

Plaintiffs contend that the government required BNA to make loans on terms that were unduly favorable to their recipients.  Plaintiffs claim that the Republic mandated these loans to garner political favor for the Republic's leadership.  In 2004 and 2006, BNA was required to refinance its existing loans to farmers at terms favorable to the farmers.  According to Fábrega, this actually involved an interest rate subsidy paid for by the Republic, not BNA, and this program applied to all banks, not just BNA.

BNA was also required to subsidize financing for the shipbuilding industry in 2006.  In 2009, BNA was required to extend lines of credit to a local truck manufacturer, IVECO, as well as buyers of IVECO trucks. In December 2010, BNA was required to provide government-subsidized loans to enable bus operators in Buenos Aires to purchase new buses. BNA also was required to provide government-subsidized loans to promote economic integration projects between Argentina and Brazil.  In early 2011, the Minister of Agriculture announced that BNA would lend to wheat farmers at a subsidized zero percent interest rate so that they would be able to hold onto their harvests until prices improved.

C. Loans to the Republic

In both the complaint and briefing of this motion, plaintiffs claim that the Republic borrows extensively from BNA, and that this strongly demonstrates the alter ego relationship.  In their complaint, plaintiffs allege that the late 2008 legislation previously discussed procured a "fundamental change in BNA's charter which significantly loosened the

restrictions on the ability of the Republic to borrow money from BNA."
The complaint was filed prior to EM and NML's admission that they
erroneously described the 2008 legislation as removing a required special
guarantee from the Department of the Treasury.  The Seijas complaint's
allegation is thus based on the erroneous version of the 2008 legislation.
However, the Seijas plaintiffs have not amended their complaint to
conform to what appear to be the facts.  Furthermore, in their argument
on the current motions, which was made many months _after_ EM and
NML corrected their error, plaintiffs still do not address the error.

Plaintiffs argue that BNA's loans to the Republic are having a
"dramatic effect on the composition of BNA's overall loan portfolio," and
are in direct contravention of BNA's mandate to serve the private sector,
in particular, small to mid-sized businesses.

Plaintiffs offer several examples of loans BNA has made to the
Republic.  As of September 2008, BNA had loaned 7.6 billion pesos to the
Republic.  BNA later extended to the Republic loans totaling 8.3 billion
pesos in 2009, 5.65 billion pesos in January 2010, and 1.2 billion pesos
in September 2010.  Plaintiffs state that prior to 2009, loans to non-
financial public sector accounted for less than 30% of BNA's total loan
portfolio.  Within one year, loans to the non-financial public sector
increased to 45% of BNA's portfolio.  BNA's exposure to the non-financial
public sector thus increased from 7.6 billion pesos in September 2008 to
18.8 billion pesos by September 2010.  According to the declaration of

Arturo C. Porzecanski, professor of international economics and finance, this is significant for a financial institution with "numerous government-mandated, special-purpose loan programs aimed at helping the private sector, and whose primary purpose is to provide financial assistance to small and medium-sized companies."

In addition, plaintiffs state that BNA holds over 38 billion pesos in government and Central Bank ("BCRA") bonds as of September 2010, up from 31 billion pesos two years earlier.  Porzecanski hypothesizes that "it is entirely possible that some portion of the cash used by BNA to purchase BCRA bonds has ended up in the government's own pockets." Porzecanski also asserts that the cumulative impact of BNA loans made to the Republic, and of bonds purchased from both the Republic and the BCRA, has meant that BNA has nearly doubled its exposure to Argentina's public sector in less than two years, from 30.5 billion pesos at the end of 2008 to 56.7 billion pesos as of September 31, 2010.

Plaintiffs further characterize BNA as unprofitable and attribute this to the Republic's alleged "control, manipulation and draining of BNA's funds."  Defendants respond that BNA ranks at the top of financial institutions within the Argentine financial system in terms of net worth, and in 2009 it earned profits of 1.215 billion pesos.

Defendants also respond to plaintiffs' allegation in the complaint that on or about "April 24, 2010, the Republic took 1.4 billion dollars (approximately 5.6 billion pesos)" from BNA.  Defendants state that, in

fact, on January 28, 2010, BNA's board adopted Resolution No. 284 approving a loan for $156 million. Defendants argue that the loan referenced in the complaint complies in all respects with BNA's charter and Argentine law, specifically Article 25 of the charter and Article 74 of Law 26,422. The interest rate on the loan is comparable to the rates charged by BNA on other dollar denominated commercial loans, and the Republic is completely current in its repayment obligations to BNA. The loan was vetted by way of a multi-step approval process, which is detailed in the second declaration of Fabrega. For example, loans to the Republic must not affect the liquidity of BNA; must not exceed 50% of BNA's capital; and BNA's outside auditor, KPMG, must provide BNA with a report that indicates compliance with BCRA requirements.

Defendants further state that <u>all outstanding loans</u> to the Republic do not exceed 30% of the deposits of the non-financial public sector of the Republic at BNA, and numerous declarations offered by defendants assert that every loan from BNA to the Republic complies with all of these requirements.

D. <u>Financial Transparency</u>

Plaintiffs claim that BNA lacks financial transparency. Plaintiffs assert that BNA discloses limited financial information to the public after months of delay in direct contravention of the charter.

Article 6 of BNA's charter requires BNA to "submit its financial statements and profit and loss accounts to the National Executive

Branch" and to "publish them within ten business days after their certification" by the BCRA.  Article 15(k) directs BNA to forward to the National Executive Branch "for information and publication" a general balance sheet, profit and loss account, and management report.

Porzecanski states that BNA provides the "barest of bones" on its financial information to the public, "publishing no quarterly or even annual reports, and revealing nothing about the nature and extent of their relationship" with the Republic.  Plaintiffs state that the Auditor General of the Republic does not publish any documents submitted by BNA, but only a summary of its own findings.  For example, on March 31, 2010, the Auditor General commented on BNA's accounting practices and financial statements in a short report.  The BCRA publishes a monthly compendium on vital statistics regarding all Argentine banks and includes information about BNA.  BNA also provides its quarterly financial accounts and operating results to Fitch Ratings, a national credit-rating agency.  Fitch Ratings then publishes quarterly reports on BNA, which provide data and are also descriptive and analytical.

Defendants offer the declaration of the Auditor General of BNA, who states that BNA must also comply with external audit rules issued by the BCRA, which require external auditors to issue an opinion regarding the fairness of BNA's financial statements, and an opinion on the work performed by the audit committee and the internal audit.  The BCRA defines the roles and responsibilities of BNA's staff, the

composition, operation and responsibility of the audit committee, as well as the functional independence of the internal audit.

Plaintiffs state that BNA regularly receives the lowest ranking for ethical standards, corporate social responsibility, and corporate governance of the forty largest Latin American financial institutions. Porzecanski draws this statistic from a ranking developed by a specialist consulting firm and the financial magazine LatinFinance.

E.  Agent for Service of Process

Plaintiffs also claim that extensive control can be found through "normal agency principles."  Plaintiffs allege that the fact that BNA is the "authorized agent" of the Republic for purposes of serving process in the bond litigation means that the Republic "unequivocally conferred actual authority on BNA."  None of this offers any support for plaintiffs' alter ego theory and the matter will not be substantially discussed further.

## DISCUSSION

### Summary Judgment Standard

Summary judgment may be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" such that the "movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  In making this determination, the court must draw all justifiable inferences in favor of the non-movant, who must establish more than mere "metaphysical

doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574, 586 (1986).

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

<u>Anderson</u>, 477 U.S. at 248. Plaintiff is entitled to the benefit of all

inferences at this stage. <u>See</u> <u>Wright v. Coughlin</u>, 132 F.3d 133, 138 (2d

Cir. 1998). Summary judgment must be denied if there is "any evidence

in the record that could reasonably support a jury's verdict for the

nonmoving party." <u>Am. Home Assur. Co. v. Hapag Lloyd Container Linie,</u>

<u>GmbH</u>, 446 F.3d 313, 315 (2d Cir. 2006).

<u>Jurisdiction and Merits of the Complaint</u>

     This court recently set out the requirements for personal and

subject-matter jurisdiction over a foreign state in accordance with the

Foreign Sovereign Immunities Act ("FSIA") in its February 15, 2010

opinion in <u>NML Capital, Ltd. v. Republic of Arg.</u>, 09 Civ. 7013. As in that

case, there is a dispute as to whether the Seijas plaintiffs pled a

sufficient jurisdictional basis over an instrumentality of a foreign state.

Here, that instrumentality is BNA.

     As an instrumentality of a foreign state, BNA is presumptively

immune from the jurisdiction of United States courts unless an exception

specified in the FSIA applies. 28 U.S.C. §§ 1604 and 1605. The

complaint alleges that two exceptions apply: waiver and commercial activity.  First, plaintiffs claim that the Republic's waiver of immunity with respect to litigation arising from its default on its sovereign debt is imputed to BNA as an alter ego of the Republic.  Second. plaintiffs claim that the Republic's commercial activity is imputed to BNA as an alter ego of the Republic.  Both exceptions depend on the validity of the alter ego theory.  This means that subject-matter jurisdiction and personal jurisdiction depend on the validity of the alter ego theory, as alleged by plaintiffs.  And, the whole thrust of the complaint, in its allegations on the merits, is the assertion of the alter ego theory.  Therefore, the essential question on both jurisdiction and the merits is whether plaintiffs sufficiently allege that BNA is an alter ego of the Republic.

Alter Ego Issue

The often-cited case dealing with the issues now before this court is First National City Bank v. Banco Para El Comercio Exterior De Cuba ("Bancec"), 462 U.S. 611, 626-27 (1983).  The case dealt with the kind of government instrumentality which BNA concededly is.  The Supreme Court stated:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to

> cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

462 U.S. at 624. The Court stated that "government instrumentalities established as juridical entities distinct and independent from their sovereigns should normally be treated as such." Id. at 626-27. Indeed, such instrumentalities "are to be accorded a presumption of independent status." Id. at 627. However, the Court examined "whether this presumption may be overcome in certain circumstances." Id. at 628. The Court held that there were indeed such circumstances and summarized them as follows:

> Thus, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other. In addition, our cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.

Id. at 629 (citations and internal quotation marks omitted). See Letelier v. Republic of Chile, 748 F.2d 790, 794-95 (2d Cir. 1984).

The principal-agent exception of Bancec has generally been characterized as referring to the question of whether the instrumentality is an "alter ego" of the sovereign. The alter ego relationship may exist if (1) the instrumentality was established to shield the sovereign from

liability, (2) the sovereign ignored corporate formalities in running the instrumentality and the sovereign exercised excessive control over the instrumentality, or (3) the sovereign has directed the instrumentality to act on its behalf, and the instrumentality has done so.  An alter ego finding is not, however, justified merely because the sovereign wholly owns the instrumentality or exercises its power as a controlling shareholder.  See Letelier, 748 F.2d at 794-95; LNC Inv., Inc. v. Republic of Nicar., 115 F. Supp. 2d 358, 363-65 (S.D.N.Y. 2000), aff'd sub nom. LNC Inv., Inc. v. Banco Central de Nicar., 228 F.3d 423 (2d Cir. 2000); William Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991); TransAmerica Leasing, Inc. v. La Republica de Venez., 200 F.3d 843, 848-50 (D.C. Cir. 2000).

As already stated, the Republic in effect owns BNA and appoints the board.  The law is clear that, in and of itself, this situation does not create an alter ego relationship.  However, plaintiffs contend that the Republic so extensively controls BNA that it is in effect nothing more than an agent of the Republic.

It should be noted that what is requested here is to have BNA declared jointly and severally liable with the Republic for all the remaining defaulted bond obligations of the Republic.  The court rejects the claim that BNA is an alter ego of the Republic leading to this result. It is a large commercial bank operating a normal commercial banking business with a multitude of depositors, borrowers, and other customers

and clients.  There is no indication that the Republic is directing the details of this business, even if the court draws all justifiable inferences in favor of plaintiffs.  To be sure, there are certain government policies which the Republic requires BNA to carry out through various banking transactions, particularly loans.  But instrumentalities of states regularly carry out the states' policies without becoming an alter ego of the state.

As to loans to the Republic, the record indicates that there was sufficient regularity in the procedures, all under the laws referred to earlier in this opinion, so that BNA was indeed a lender to the Republic, but this does not turn BNA into an alter ego of the Republic.

The court also rejects the allegation that the level of financial transparency creates such extensive control as to turn BNA into an alter ego of the Republic.

Thus, plaintiffs put forth insufficient evidence of day-to-day or excessive control to establish that BNA is an alter ego of the Republic.

A word must be said about the claim that BNA should be held liable under that branch of <u>Bancec</u> which states that the presumption of separateness of an instrumentality may be overcome when recognizing the corporate entity as independent would work a "fraud or injustice" against the government's creditors.  462 U.S. at 630; <u>Letelier</u>, 748 F.2d at 794-95.  BNA's alleged role as the Republic's "fiscal agent" and its role as agent <u>solely</u> for service of process in connection with the bond litigation do not mean that BNA was "integrally involved" in the

Republic's bond issuance.  It is surely true that the Republic has failed to pay its just bond debts and its judgment debts, and this is, in the view of the court, serious wrongdoing.  But, there is no basis whatsoever for any claim that BNA has been used to further this objective.

### CONCLUSION

For the foregoing reasons, the court holds that plaintiffs have failed to establish that BNA is an alter ego of the Republic of Argentina.  The court therefore does not have subject-matter jurisdiction over this action. Defendants' motions for summary judgment are granted, and the complaint is dismissed.

This resolves the motions listed as document numbers 10 and 13 in this case.

SO ORDERED.

Dated: New York, New York
       March 28, 2011

Thomas P. Griesa
U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 03/28/11

- 26 -